## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLISON M. OVERCASH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-737-RGA |
| | ) |
| ANDREW SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **REPORT AND RECOMMENDATION**

## **I. INTRODUCTION**

Plaintiff Allison M. Overcash ("Overcash") filed this action on April 25, 2019, against

the defendant Andrew Saul, the Commissioner of the Social Security Administration (the

"Commissioner"). Overcash seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's March 5, 2019 final decision, denying Overcash's claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434.

Currently before the court are cross-motions for summary judgment filed by Overcash

and the Commissioner.[2] (D.I. 9; D.I. 14) Overcash asks the court to remand her case for further

administrative proceedings. (D.I. 10 at 27) The Commissioner requests the court affirm the

Administrative Law Judge's ("ALJ") decision. (D.I. 15 at 21) For the reasons set forth below,

the court recommends GRANTING-IN-PART, DENYING-IN-PART Overcash's motion for

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019 to succeed
Acting Commissioner Nancy A. Berryhill. Pursuant to Federal Rule of Civil Procedure 25(d)
and 42 U.S.C. § 405(g), Andrew Saul was automatically substituted as the Defendant in this
action.

[2] The briefing for the present motions is as follows: Overcash's opening brief (D.I. 10) and the
Commissioner's combined opening brief in support of his motion for summary judgment and
answering brief (D.I. 15). Overcash stands upon her opening brief. (D.I. 16)

summary judgment (D.I. 9), GRANTING-IN-PART, DENYING-IN-PART the Commissioner's cross-motion for summary judgment (D.I. 14), and remanding-in-part for further administrative proceedings to address the functional effects of Overcash's migraine headaches in assessing her residual functional capacity.

## II.   BACKGROUND

### a.  Procedural History

Overcash filed a DIB application on April 2, 2015,[3] claiming a disability onset date of March 11, 2011. (D.I. 7-5 at 2-3) Her claim was initially denied on February 18, 2016, and denied again after reconsideration on June 10, 2016.[4] (D.I. 7-4 at 5-9, 12-16) Overcash then filed a request for a hearing, which occurred on April 18, 2018. (D.I. 7-2 at 34-86) Administrative Law Judge NaKeisha Blount issued an unfavorable decision, finding that Overcash was not disabled under the Act on May 25, 2018. (*Id.* at 14-24) The Appeals Council subsequently denied Overcash's request for review on March 5, 2019, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 2-4)

On April 25, 2019, Overcash brought a civil action in this court challenging the ALJ's decision that she was not under a disability within the meaning of the Act from March 11, 2011, through the December 31, 2016, the date she was last insured. (D.I. 1) On September 6, 2019, Overcash filed a motion for summary judgment, and on November 4, 2019, the Commissioner filed a cross-motion for summary judgment. (D.I. 9; D.I. 14)

---

[3] The ALJ noted that Overcash filed her DIB application on February 27, 2015, but the application is dated April 2, 2015. (D.I. 7-2 at 14; D.I. 7-5 at 2-3)

[4] The Notice of Disapproved Claim on Reconsideration is not dated, but the ALJ noted that Overcash's claim was denied upon reconsideration on June 10, 2016. (D.I. 7-2 at 14; D.I. 7-4 at 12-16)

### b. Medical History

Overcash was born on May 24, 1975, and was 35 years old on her alleged disability onset date. (D.I. 7-3 at 25) Overcash graduated from law school. (D.I. 7-17 at 39) Overcash has past relevant work history as a substitute teacher, mortgage title representative, legal assistant, and attorney. (D.I. 7-2 at 23) The ALJ concluded that Overcash has the following severe impairments: lumbar degenerative disc disease with radiculopathy, muscle spasms, neuropathy, and migraines. (*Id.* at 16)

On April 17, 2011, Overcash gave birth to twins. (D.I. 7-12 at 36, 54) On May 13, 2011, she visited Dr. Dana L. Newswanger ("Dr. Newswanger"),[5] who recommended physical therapy for Overcash's bilateral foot pain and swelling and "pins and needles" in her right knee and shoulder. (D.I. 7-9 at 13; D.I. 7-19 at 6) Six days later, Overcash received an initial evaluation from Dr. Jennifer Briggs, DPT ("Dr. Briggs"), who noted that she experienced bilateral upper extremity and lower extremity paresthesias, heel pain, and poor core stability postpartum. (D.I. 7-9 at 39) Overcash regularly participated in physical therapy from May 2011 through August 2011 for pain, numbness and tingling in her foot, heel, and hand. (*Id.* at 15-29) On June 2, 2011, Overcash stated that she had decreased hand and finger tingling. (*Id.* at 28) On June 6, 2011, Overcash reported less intense and less frequent heel pain. (*Id.* at 27) At a June 16, 2011 physical therapy session, Overcash reported significant improvement and minimal lower back and neck pain. (*Id.* at 12) On July 5, 2011, Overcash stated that she had no left foot or heel pain, and only minimal soreness and pain in her right heel and foot. (*Id.* at 22)

---

[5] Dr. Newswanger is Overcash's primary care doctor. (D.I. 7-2 at 43)

3

On July 12, 2011, Overcash started seeing Dr. Michael Francis, D.C. ("Dr. Francis") for pain and numbness in her lumbrosacral regions radiating to her legs and feet, intermittent pain in her neck and thoracic regions radiating to her bilateral arms, and pain in her right heel and inner ankle. (D.I. 7-8 at 35) She continued treatment with Dr. Francis through August 17, 2011. (*Id.* at 26-35) On July 18, 2011, Dr. Michele Holding ("Dr. Holding") conducted an EMG nerve conduction study of Overcash's bilateral lower extremities, which revealed: (1) an acute incomplete injury to her bilateral deep peroneal nerve distal to the ankle and foot, (2) an acute incomplete injury to her medial plantar nerve, (3) acute lumbrosacral radiculopathy, and (4) a chronic right deep peroneal nerve injury. (*Id.* at 2-6) On the same day, she visited Dr. Newswanger, describing left foot pain, tingling up and down her legs, tingling and numbness in her heel, decreased foot swelling, and difficulty walking. (D.I. 7-19 at 4) On July 26, 2011, Overcash visited Dr. William Sommers, D.O. ("Dr. Sommers"), who observed a slightly antalgic gait pattern but full strength in all muscle groups. (D.I. 7-8 at 16-17)

On August 1, 2011, Overcash received an MRI of her lumbar spine, which showed degenerative changes at the L4-L5 vertebrae and a small disc bulge. (*Id.* at 9-10) On August 5, 2011, Overcash visited Dr. Newswanger, complaining of a constant "electric current" in her feet and back spasms that radiated down both legs. (D.I. 7-14 at 12) Dr. Newswanger noted no focal deficits and normal reflexes, coordination, and muscle strength and tone. (*Id.* at 10) Four days later, she visited Dr. Sommers, who noted that her symptoms had improved slightly, despite experiencing severe right heel pain exacerbated by weightbearing and an electrical-like sensation in both feet travelling up to her knees. (D.I. 7-8 at 14) He suggested that her symptoms may be caused by plantar fasciitis on the right, bilateral tarsal tunnel syndrome, and lumbrosacral radiculopathy. (*Id.*) At an August 10, 2011 physical therapy session, Overcash stated that she

4

was able to push her babies in a stroller for the first time. (D.I. 7-9 at 17) She exhibited a normal gait pattern, but reported pain in her right heel. (*Id.*) On August 25, 2011, Dr. Briggs reported that Overcash's pain, range of motion, and strength had improved and that she was ready to transition to a home exercise program. (*Id.* at 15)

On November 2, 2011, Overcash visited Dr. Deborah Zarek ("Dr. Zarek") and described severe headaches, numbness around her right eye, dizziness, and muscle spasms. (D.I. 7-10 at 17) On November 4, 2011, Overcash received an MRI and MRA of her brain, which demonstrated normal results. (*Id.* at 19-20) One week later, she received an MRI of her cervical spine, which showed an asymmetrically increased signal in the left vertebral artery, but no protrusion or stenosis. (*Id.* at 23) On November 18, 2011, she received a bilateral carotid ultrasound, which did not show evidence of a significant hemodynamic lesion or stenosis. (*Id.* at 24)

On March 12, 2012, Overcash visited Dr. Joshua Feinberg, D.O. ("Dr. Feinberg") and complained of low back pain exacerbated by lifting her children. (D.I. 7-15 at 12) She returned to Dr. Feinberg on March 29, 2012 for continued low back pain. (*Id.* at 21) On April 2, 2012, Overcash received an MRI of her brain and an MRA of her head, both of which revealed no acute intracranial abnormality and no evidence of significant stenosis or vascular injury. (D.I. 7-10 at 29, 31) On April 10, 2012, Overcash visited Dr. Lisa Leschek-Gelman ("Dr. Leschek-Gelman"), who recommended taking aspirin daily for chronic complicated migraines. (*Id.* at 34) On December 3, 2012, Overcash visited Dr. Scott Roberts ("Dr. Roberts"), who noted bilateral low back pain in the lower lumbar region radiating to her bilateral lower extremities. (D.I. 7-15 at 80) Overcash stated that the pain worsened when lying down and improved by changing positions. (*Id.*) She experienced weakness in her left lower extremity and tingling in both legs.

5

(*Id.*) On December 10, 2012, Overcash returned to Dr. Leschek-Gelman and complained of worsening lower back pain. (D.I. 7-10 at 58) Four days later, Overcash received an MRI of her lumbar spine, which revealed a small central disc protrusion at the L4-L5 vertebrae. (*Id.* at 60)

On October 29, 2013, Overcash visited Michele L. Gould, PT ("Ms. Gould") for joint dysfunction, right piriformis tightness, and core weakness that contributed to right lower extremity pain and right lumbopelvic weakness. (D.I. 7-11 at 36) Three days later, Overcash described a right posterior lower extremity pain which limited her ability to walk. (*Id.* at 80) On November 4, 2013, Overcash returned to physical therapy with Ms. Gould and reported continued lower extremity pain, especially when pushing a cart at a store. (*Id.* at 72) Three days later, Overcash reported less intense right lower extremity pain during a one block walk with her children. (*Id.* at 76) Throughout her physical therapy sessions in November 2013, Overcash reported left lower extremity tingling, left lower back spasms, and lower back pain. (*Id.* at 60-68) At a December 3, 2013 session with Ms. Gould, Overcash reported persistent lower extremity nerve irritation, but more pain-free walking. (*Id.* at 56) Two days later, Overcash described hip tightness after doing laundry. (*Id.* at 52) On December 19, 2013, she reported less left lower extremity tingling. (*Id.* at 46) On December 23, 2013, Ms. Gould noted increased left lower extremity pain and tingling. (*Id.* at 39) Ms. Gould observed that Overcash had a nonantalgic gait despite her perception of internal rotation of her legs and feet. (*Id.*)

On May 21, 2014, Overcash visited Dr. Leschek-Gelman and reported that she was regaining feeling and sensitivity in her legs, but still experienced numbness and tingling in her left leg and foot. (D.I. 7-15 at 71) She described intermittent pain and cramping in her legs. (*Id.*) Although she felt off-balance, Overcash exhibited a normal gait and full strength in all extremities. (*Id.* at 71, 73) Overcash noted that she experienced severe migraines before and

after her menstrual cycle, accompanied by nausea, vomiting, and light sensitivity. (*Id.* at 71) On June 4, 2014, Overcash received an MRI of her lumbar spine, which revealed a stable broad-based central L4-L5 protrusion slightly compressing the ventral thecal sac without significant central stenosis or definite nerve root compression. (*Id.* at 58) On June 19, 2014, she visited Dr. Feinberg for increased low back pain after sitting for a long time at a concert. (D.I. 7-18 at 27) Dr. Feinberg observed full strength in her lower extremities and a full range of motion. (*Id.* at 29)

She participated in physiotherapy treatments with Dr. Kenneth S. Dill ("Dr. Dill") from June 23, 2014 to January 2, 2015. (D.I. 7-13 at 2-26) On June 23, 2014, Dr. Dill noted an abnormal gait pattern, low back pain, and bilateral lower extremity radiculopathy. (*Id.* at 2) On July 1, 2014, Overcash noted that her overall condition had improved slightly and her pain decreased with the performance of activities of daily living. (*Id.* at 7) Two days later, she advised that her overall condition was improving and that she was complying with her home exercise program. (*Id.* at 9) Dr. Dill noted that Overcash had decreased numbness, improved nerve irritation, increased range of motion, and increased spasms. (*Id.* at 9-10) Over the next two weeks, Overcash continued to report increased mobility and decreased pain, tingling, stiffness, and spasms. (*Id.* at 11-16) On July 21, 2014, Overcash stated that her "legs are feeling more normal." (*Id.* at 17) Dr. Dill noted decreased tingling and increased muscular strength. (*Id.* at 18) Eight days later, Overcash reported increased pain by "overdoing" her activities of daily living, but decreased pain after physiotherapy. (*Id.* at 21-22) On September 10, 2014, Overcash visited Dr. Leschek-Gelman, who observed a normal gait and full strength in her lower extremities. (D.I. 7-16 at 32-35)

On October 14, 2014, Overcash received a consultation from Dr. Meredith H. Penny,

DPT ("Dr. Penny") and described numbness on her right side, pain down the front of thighs and

knees, and a "floppy" feeling in her legs. (D.I. 7-14 at 17) Dr. Penny noted that Overcash's

bilateral lower extremity tingling, numbness and pain limited her ability to perform housework,

care for her children, and walk. (*Id.* at 18) Overcash attended physical therapy with Dr. Penny

from October 21, 2014 through January 8, 2015. (*Id.* at 20-59) At an October 27, 2014 session,

Overcash reported increased tingling. (*Id.* at 30) Dr. Penny observed that her right leg was

weaker than her left leg and she experienced more pain in her right knee than her left knee. (*Id.*)

Three days later, Overcash stated that the exercises made her feel "amazing" and that she was

able to walk to the park with her children. (*Id.* at 32) After walking to the park, she experienced

a tolerable pain in her knees that Dr. Penny opined was due to increased activity levels. (*Id.*)

On November 3, 2014, Overcash reported burning and weakness in her right leg when

walking. (*Id.* at 34) However, she stated that the exercises made her feel "great," her knees felt

better, and overall tingling had reduced. (*Id.*) Three days later, she stated that she felt stronger

and that the exercises helped alleviate her pain. (*Id.* at 36) On November 10, 2014, Overcash

reported that severe migraines limited her activity levels outside of physical therapy. (*Id.* at 38)

Three days later, she reported feeling "the best she has felt." (*Id.* at 40) On November 18, 2014,

Overcash reported a forty percent improvement overall, with increased tolerance for exercise and

improved sensation in her lower back. (*Id.* at 20) Dr. Penny noted "significant functional and

symptomatic relief since the beginning of therapy." (*Id.*) Two days later, Overcash stated that

lifting heavy dry cleaning had triggered her tingling symptoms but she was able to walk for

fifteen minutes and perform squats at the gym. (*Id.* at 42) On November 24, 2014, Overcash

reported that her left leg was feeling more normal and that she was able to do laundry. (*Id.* at 44)

At a December 2, 2014 session with Dr. Penny, Overcash recounted how she did some laundry, but stopped after experiencing numbness in her leg. (*Id.* at 46) The numbness reportedly went away after one minute of rest, though she experienced tingling in her right index and middle fingers. (*Id.*) Dr. Penny noted that Overcash continued to demonstrate functional improvements, including playing on the ground with her son, but remained limited by continued tingling and numbness. (*Id.*) On December 16, 2014, Overcash visited Dr. Leschek-Gelman, who noted a normal gait and full strength in her extremities. (D.I. 7-16 at 28-30) Two days later, she described being able to do one load of laundry with some tolerable tingling, walk for twenty minutes, and consistently sit on the floor with her children. (D.I. 7-14 at 54) She reported improvement in her right hand and left leg. (*Id.*) Dr. Penny noted increased function at home. (*Id.*) On December 29, 2014, Overcash complained of low back pain but noted that she was able to give her children a bath and walk twenty-two minutes every other day. (*Id.* at 56)

On January 2, 2015, Dr. Dill reported a seventy percent overall improvement in Overcash's symptoms, increased mobility, improved nerve irritation, and decreased stiffness. (D.I. 7-13 at 25-26) Overcash was discharged to a home exercise program. (*Id.* at 26) Three days later, Overcash returned to physical therapy with Dr. Penny and reported increased nerve irritation despite overall improvements. (D.I. 7-14 at 22) Dr. Penny noted that Overcash played on the floor with her children and walked approximately twenty minutes at one time, but continued to experience difficulty doing laundry. (*Id.*) At a January 8, 2015, session with Dr. Penny, Overcash stated that her nerve irritation had decreased by sixty percent and was improved with walking. (*Id.* at 24) Dr. Penny noted that Overcash's symptoms were worse with movement and improved by being still. (*Id.*) In a discharge summary from the same day, Dr. Penny described Overcash's slow but notable functional progress, including her increased ability

9

to walk, sit on the floor with her children, and perform light household tasks. (*Id.* at 59) Dr. Penny noted minimal improvements in Overcash's pain and radicular symptoms. (*Id.*)

On February 5, 2015, she visited Dr. Feinberg, complaining of a "floppy" feeling in her legs, significant lumbar radiculopathy, and menstrual migraines. (D.I. 7-15 at 29) She stated that she experienced relief from her menstrual migraines by lying down and that Tylenol was ineffective. (*Id.*) On March 19, 2015, Overcash visited Dr. Jeffrey S. Berger, D.O. ("Dr. Berger") for bilateral low back pain and "floppy" feet and legs. (D.I. 7-16 at 48) Dr. Berger noted a normal tandem gait, normal balance, and full strength. (*Id.* at 49) Dr. Berger encouraged her to remain active, recommended that she continue her daily walking, and suggested swimming. (*Id.* at 50)

In an April 24, 2015 function report, Overcash outlined her daily routine as dropping off her children at daycare, dropping off her husband at work, driving home, and watching television or reading. (D.I. 7-6 at 42) She described how her mother accompanies her and helps with grocery shopping, cleaning the house, and picking up her children from daycare. (*Id.*) She stated that she can no longer walk for long periods of time, exercise, sit comfortably for long periods of time, drive without pain, lift heavy objects, grocery shop, or sit or kneel on the floor. (*Id.* at 43) She reported that she cannot do any housework except cleaning the counter and loading and unloading the dishwasher. (*Id.* at 44) Overcash noted that although she can drive, she shops with her mother because she can only pick up small, light items. (*Id.* at 45) She tries to attend church twice per month but finds it difficult to sit in a pew. (*Id.* at 46)

The next day, Overcash completed a headache/migraine questionnaire, wherein she described experiencing headaches before and after menstruating. (*Id.* at 38) She stated that the pain is accompanied by nausea and vomiting and usually lasts twenty-four hours. (*Id.*) To

alleviate her pain, she takes Tylenol and lies down in a cool, dark place. (*Id.* at 38-39) On the same day, Overcash completed a pain questionnaire, wherein she described painful nerve irritation in her spine and pelvic floor region, which radiates down her arms and legs and into her feet. (*Id.* at 40) The pain is aggravated by movement and, therefore, she finds it difficult to walk. (*Id.*) She described her inability to play on the floor with her children, walk for long periods of time, clean her house, do laundry, grocery shop independently, or exercise. (*Id.* at 41)

At a May 6, 2015 appointment with Dr. Berger, Overcash reported significant improvement and normalization of her walking. (D.I. 7-16 at 74) Dr. Berger noted smooth sit-to-stand transfers and ambulation with relative hip anteversion on the right side. (*Id.*) Overcash stated that her symptoms improved with walking and that she continued to take Tylenol for pain. (*Id.*) On October 28, 2015, Overcash returned to Dr. Berger, complaining of continued but improved "flopping sensation" in her feet and legs. (*Id.* at 76) Dr. Berger noted that although Overcash had a weak core, walking and moving helped alleviate her pain. (*Id.*) He encouraged physical therapy, walking, and swimming. (*Id.*) At a November 2, 2015 appointment with Dr. Leschek-Gelman, Overcash reported lumbar pain and migraines that she was usually able to control with Tylenol. (*Id.* at 82)

On February 15, 2016, Overcash was evaluated, at the Agency's request, by Dr. Irwin Lifrak ("Dr. Lifrak"), and complained of pain in her lower back with radiation to the pelvic area, both hips, and both lower extremities. (D.I. 7-15 at 90) Dr. Lifrak observed a mild degree of limp favoring her left lower extremity and an inability to walk on her heels or toes. (*Id.* at 92) Dr. Lifrak opined that, in an eight-hour day, Overcash was able to sit and stand for six hours and could lift ten pounds with either hand on a regular basis. (*Id.* at 94)

11

On February 18, 2016, Dr. Joseph Michel ("Dr. Michel")[6] opined that Overcash had the residual functional capacity ("RFC") to perform work at the light exertional level. (D.I. 7-3 at 22) Specifically, Dr. Michel concluded that Overcash could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. (*Id.* at 19) Furthermore, he stated that Overcash could stand, walk, and sit for approximately six hours in an eight-hour workday. (*Id.*) On March 12, 2016, Overcash visited Anne Collins Duch, MPT ("Ms. Duch"),[7] who acknowledged her slow and steady improvement and continued functional limitations. (D.I. 7-17 at 27) Ms. Duch opined that Overcash cannot sit for longer than thirty minutes and cannot ambulate consistently for longer than twenty to thirty minutes. (*Id.*) On May 3, 2016, Overcash visited Dr. Dagmara Marta Pychynski ("Dr. Pychynski")[8] for neuropathy, low back pain, pelvic pain, and migraines. (D.I. 7-19 at 107) Dr. Pychynski observed that Overcash's neuropathy worsened with movement. (*Id.*) Furthermore, Dr. Pychynski noted normal gait, normal muscle tone, and full strength in her upper and lower limbs. (*Id.* at 110) On November 29, 2016, she returned to Dr. Pychynski and reported no improvement with her menstrual migraines, but noted that taking Tylenol helped alleviate the pain. (*Id.* at 112) Dr. Pychynski noted a normal gait, normal muscle tone, and full strength in her upper and lower limbs. (*Id.* at 115-116) On June 7, 2016, Dr. Darrin Campo ("Dr. Campo")[9] concluded that Overcash had the RFC to complete past relevant work. (D.I. 7-3 at 40)

---

[6] Dr. Michel is a state agency medical consultant. (D.I. 7-3 at 2-23)

[7] Ms. Duch is Overcash's physical therapist who continues to provide treatment. (D.I. 7-2 at 57, 60-62)

[8] Dr. Pychynski is Overcash's neurologist. (D.I. 7-17 at 55) Dr. Leschek-Gelman was Overcash's previous neurologist who left the practice at the Christiana Neurology clinic in 2016. (*Id.*)

[9] Dr. Campo is a state agency medical consultant. (D.I. 7-3 at 25-41)

In a December 29, 2016 functional capacity evaluation, Dr. Alyssa Skolfield, DPT ("Dr. Skolfield")[10] opined that Overcash was unable to perform at the sedentary level in an eight-hour workday because of her inability to perform activities at the occasional or frequent level, inability to perform positional tolerances at the occasional level, increased fatigue, decreased lower extremity range of motion, and increased lumbar spine pain with activity. (D.I. 7-18 at 102) Dr. Skolfield suggested that she was unable to climb ladders, reach floor level, stoop, kneel, crouch, or crawl. (*Id.* at 103) Overcash could reportedly perform the following activities of daily living independently: dressing, grooming, bathing, and hygiene. (*Id.* at 104) Overcash stated that she required moderate assistance with cleaning, cooking, and doing laundry. (*Id.*) Dr. Skolfield observed an antalgic gait pattern, increased lumbar pain, and increased fatigue following the functional capacity examination. (*Id.* at 105, 107)

In a January 12, 2017 medical source statement, Ms. Duch opined that Overcash could lift five pounds occasionally, walk 400 feet without stopping, stand for two nonconsecutive hours in an eight-hour workday, sit for three hours in an eight-hour workday, and remain at her workstation for five hours in an eight-hour workday.[11] (D.I. 7-17 at 49) Ms. Duch concluded that Overcash was unable to perform sedentary or light work for eight hours per day. (*Id.* at 50) On February 3, 2017, Dr. Pychynski completed a medical source statement and concluded that Overcash was unable to perform sedentary or light work for eight hours per day. (*Id.* at 54) On March 4, 2017, Dr. Newswanger completed a medical source statement, wherein she opined that

---

[10] Dr. Skolfield is a physical therapist who Overcash visited for a functional capacity evaluation ("FCE"). (D.I. 7-18 at 102-107)

[11] Overcash was last insured for the purposes of the Act as of December 31, 2016. (D.I. 7-2 at 16) However, the court reviews the 2017 and 2018 opinions of Ms. Duch, Dr. Pychynski, and Dr. Newswanger because the ALJ reviewed these opinions in determining Overcash's residual functional capacity and plaintiff contests in the instant case the ALJ's assessment of the weight of these opinions. (D.I. 7-2 at 21-22; D.I. 10 at 15-23)

13

Overcash can occasionally lift five pounds, stand for two hours in an eight-hour workday, sit for three hours in an eight-hour workday, remain at her workstation for five hours in an eight-hour workday, and would need to change positions every twenty to thirty minutes. (D.I. 7-11 at 88) Dr. Newswanger concluded that she could not perform sedentary or light work for eight hours per day. (*Id.* at 89)

In a January 21, 2018 assessment, Ms. Duch stated that Overcash could occasionally lift five pounds, stand for ten to fifteen minutes at one time, walk half of a mile slowly without stopping, and sit for six hours in an eight-hour workday with frequent breaks. (D.I. 7-20 at 41) Ms. Duch stated that, despite "not assess[ing] fully," Overcash could remain at her workstation for four hours in an eight-hour workday. (*Id.*) She concluded that Overcash could not perform sedentary or light work for eight hours per day. (*Id.* at 42)

### c. Hearing Before ALJ Blount

#### i. Overcash's Testimony

Overcash testified that, after the birth of her twins in 2011, she experienced swelling and neuropathy in her legs and feet. (D.I. 7-2 at 42-43) She stated that she experiences numbness on the right side of her body. (*Id.* at 46) She stated that since giving birth, she has experienced severe migraine headaches before and after her menstrual cycle. (*Id.* at 48-49) When she experiences these menstrual migraines, she needs to lie down in a dark, quiet room and take Tylenol. (*Id.*) Her menstrual migraines are oftentimes accompanied by nausea. (*Id.* at 48-50) She testified that her migraines would affect her three days per month. (*Id.* at 50) Furthermore, Overcash testified that her legs feel "floppy" and that she experiences severe back pain. (*Id.* at 50, 52) She experiences feelings of anxiety, depression, and isolation. (*Id.* at 53-54)

14

Overcash testified that her mother helps her with her children's activities by carrying bags and changing her children. (*Id.* at 54) Overcash stated that, after giving birth, she could not lift her children without experiencing pain or neuropathy. (*Id.* at 63-64) As a result, she relied on daycare and her family members to help with childcare. (*Id.* at 64-65) She has difficulty cooking, but does not have any difficulty driving. (*Id.* at 60, 66-67) She stated that she can load the dishwasher, transfer the laundry from washer to dryer, and carry an empty laundry basket upstairs. (*Id.* at 67-68) She cannot put things in lower cupboards or vacuum. (*Id.*) Overcash testified that she does not think she can return to work because of her weakness, severe pain, and neuropathy. (*Id.* at 65-67)

### ii. Vocational Expert's Testimony Before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

I'm going to ask you about a hypothetical individual, and I'd like you to assume the individual is of the claimant's age, education, and experience. And assume that the individual could perform sedentary work; frequently climb ramps and stairs; never claim [*sic*] ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; tolerate occasional exposure to extreme cold, extreme heat, wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. Would such an individual be able to perform the claimant's past jobs?

(D.I. 7-2 at 77) The VE testified that this individual would not be able to perform claimant's past work at the light exertional level, which included her work as a substitute teacher, legal assistant, and attorney. (*Id.* at 75-77) However, the VE testified that this individual would be able to perform work as a mortgage title representative at the sedentary exertional level. (*Id.* at 77) The ALJ asked whether a limitation of frequent reaching bilaterally would change the VE's response. (*Id.* at 78) The VE testified that the limitation would not change his response. (*Id.*) The ALJ inquired whether a limitation of frequently interacting with supervisors, coworkers, and the public would change the VE's response. (*Id.*) The VE testified that the hypothetical

individual would not be able to perform any of claimant's past work, which required interacting with others for more than two-thirds of the day. (*Id.*)

The ALJ asked whether there were any other jobs in the national economy that such an individual could perform. (*Id.*) The VE testified that the following work at the sedentary exertional level was available to the hypothetical individual: security monitor, sorter/inspector in any industry, and information clerk. (*Id.* at 78-79) The ALJ asked whether a limitation of being able to move from a seated position to a standing position or standing and walking position to a seated position for five minutes out of every hour would change the VE's response. (*Id.* at 79) The VE testified that such a limitation would not change his response, but noted that it might reduce the number of jobs available in the national economy by about five to ten percent. (*Id.*)

Overcash's attorney asked whether the individual would be able to maintain employment in these jobs if the individual missed three days per month from work. (*Id.* at 80) The VE testified that the individual would not be able to maintain employment. (*Id.*) Overcash's attorney asked whether the individual would be able to maintain employment if the individual were off task fifteen percent of the time. (*Id.*) The VE testified that the individual would not be able to maintain employment. (*Id.*) Overcash's attorney asked whether the individual would be able to maintain employment if the individual needed to lie down because of migraine headaches for three hours several times per week. (*Id.*) The VE testified that the individual would not be able to maintain employment. (*Id.*) Overcash's attorney inquired whether the individual would be able to maintain employment if the individual was not able to stay at a work station eight hours per day on a consistent basis. (*Id.*) The VE testified that the individual would not be able to maintain employment. (*Id.* at 81)

**d. The ALJ's Findings**

Based on the factual evidence in the record and the testimony by Overcash and the VE,

the ALJ determined that Overcash was not disabled under the Social Security Act for the

relevant time period of March 11, 2011, the alleged onset date of the disability, through

December 31, 2016, the date last insured. (D.I. 7-2 at 24) The ALJ found in pertinent part:

1. The claimant last met the insured status requirements of the Social Security
   Act on December 31, 2016.

2. The claimant did not engage in substantial gainful activity during the period
   from her alleged onset date of March 11, 2011 through her date last insured of
   December 31, 2016 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe
   impairments: lumbar degenerative disc disease with radiculopathy, muscle
   spasms, neuropathy, and migraines (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or
   combination of impairments that met or medically equaled the severity of one
   of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
   404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date
   last insured, the claimant had the residual functional capacity to perform
   sedentary work as defined in 20 CFR 404.1567(a) except she can frequently
   climb ramps/stairs; never climb ladders/ropes/scaffolds; and occasionally
   balance, stoop, kneel crouch [*sic*], crawl. She can have occasional exposure to
   extreme cold, extreme heat, wetness, humidity, noise, vibrations,
   fumes/odors/dusts/gases/poor ventilation/hazards. She must have the
   opportunity to change from a seated position to a standing/walking or a
   standing/walking to a seated position for five minutes out of every hour, while
   remaining on task.

6. Through the date last insured, the claimant was unable to perform any past
   relevant work (20 CFR 404.1565).

7. The claimant was born on May 24, 1975 and was 41 years old, which is
   defined as a younger individual age 18-44, on the date last insured (20 CFR
   404.1563).

8. The claimant has at least a high school education and is able to communicate
   in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from March 11, 2011, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(g)).

(*Id.* at 16-24)

## III.  STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks
omitted); *Biestek*, 139 S. Ct. at 1154.

Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ]
ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is
evidence substantial if it is overwhelmed by other evidence – particularly certain
types of evidence (e.g., that offered by treating physicians) – or if it really
constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110,

114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a

claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain

and specify his reasons for rejecting these claims and support his conclusion with medical

evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefits cases,

'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if

the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225

F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A

district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g)

affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the

[Commissioner] for a rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### a. Disability Determination Process

The core issue in this case is whether Overcash was disabled within the meaning of the

Act at any time from March 11, 2011, the alleged onset date of the disability, through December

31, 2016, the date last insured. (D.I. 7-2 at 24) Title II of the Social Security Act affords

insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(l)(D) (2015)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *See id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a particular claimant has met his burden of establishing disability. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the

20

Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the RFC to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

### b. Whether the ALJ's Decision is Supported by Substantial Evidence

On May 25, 2018, the ALJ found that Overcash was not disabled from the alleged

disability onset date of March 11, 2011 through the date last insured, December 31, 2016. (D.I.

7-2 at 24) The ALJ concluded that, despite Overcash's severe impairments (lumbar degenerative

disc disease with radiculopathy, muscle spasms, neuropathy, and migraines), she had the RFC to

perform a full range of work at the sedentary exertional level. (*Id.* at 19) Overcash asserts three

main arguments on appeal: (1) the ALJ failed to provide adequate reasons for affording

Overcash's treating sources some, little, or limited weight, (2) the ALJ's hypothetical to the VE

failed to describe all of her impairments, and (3) the ALJ failed to account for Overcash's

migraine headaches in her RFC finding. (D.I. 10 at 15-27)

### i. Medical Opinion Evidence

Overcash argues that the ALJ erred by failing to provide adequate reasons for assigning

some, little, or limited weight to the opinions of Dr. Newswanger, Dr. Pychynski, Ms. Duch, and

Dr. Skolfield. (D.I. 10 at 15-23) Specifically, Overcash contends that the ALJ failed to evaluate

the medical opinions pursuant to 20 C.F.R. § 404.1527(c).[12] (*Id.* at 15-18) These factors

include: examining relationship, treatment relationship, supportability, consistency,

specialization, and other factors such as the extent to which the medical source is familiar with

other information in the case. *See* 20 C.F.R. § 404.1527(c).

---

[12] Overcash argues that the ALJ erred when she failed to have the record reviewed by an expert.
(D.I. 10 at 22-23) Overcash suggests that the ALJ should have recontacted treating medical
sources, scheduled a consultative examination, scheduled review of the record and testimony by
a medical expert, or send the updated case record to the state agency for review by a medical
consultant. (*Id.*) She does not cite any legal authority for her contention that the ALJ erred by
failing to recontact treating medical sources or otherwise having the record reviewed by an
expert. (*Id.*)

22

Although the findings and opinions of treating physicians are entitled to substantial weight, "'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Instead, the determination of RFC and disabilities are issues reserved for the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). Moreover, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with other substantial evidence in [the] case record.'" *See Scouten v. Comm'r of Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)). It is not for the court to re-weigh the medical opinions in the record, but rather to "determine whether substantial evidence exists to support the ALJ's weighing of those opinions." *Ransom v. Berryhill*, C.A. No. 17-939-LPS, 2018 WL 3617944, at *7 (D. Del. July 30, 2018) (citing *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008)).

"[A]n ALJ need not explicitly discuss each [20 C.F.R. § 404.1527(c)] factor in his decision . . . . Instead, an ALJ need only explain his evaluation of the medical evidence for the district court to meaningfully review whether his reasoning accords with the regulation's standards." *Samah v. Comm'r of Soc. Sec.*, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018) (internal quotation marks and citations omitted). Here, the ALJ considered all relevant factors in determining how much weight to afford the opinions of Dr. Newswanger, Dr. Pychynski, Ms. Duch, and Dr. Skolfield. The ALJ recognized that Dr. Newswanger was Overcash's treating primary care physician, but explained that she gave her opinion "some weight" because her opinion was inconsistent with other evidence of record. (D.I. 7-2 at 22) The ALJ noted that, in a medical source statement, Dr. Newswanger opined that Overcash could sit for three hours in an eight-hour workday, stand for two hours in an eight-hour workday, remain at her workstation for

23

five hours in an eight-hour workday, and lift and carry up to five pounds occasionally. (D.I. 7-11 at 88) Dr. Newswanger noted that Overcash needed to change positions every twenty to thirty minutes. (*Id.*) However, the ALJ noted that Dr. Newswanger's medical source statement was inconsistent with the record. (D.I. 7-2 at 22) For example, Overcash's physical therapists and previous neurologist, Dr. Leschek-Gelman, noted her normal gait and full strength in her lower extremities. (D.I. 7-9 at 17; D.I. 7-11 at 39; D.I. 7-14 at 54; D.I. 7-15 at 71, 73; D.I. 7-16 at 32-35, 49) Furthermore, Overcash reported alleviation of her lower extremity pain and tingling through walking and exercise. (D.I. 7-13 at 7; D.I. 7-14 at 20, 32-36, 40; D.I. 7-16 at 74-76)

As to Dr. Pychynski, the ALJ found that her medical source statement was inconsistent with the evidence of record and, therefore, assigned her opinion "little weight." (D.I. 7-2 at 22) In her medical source statement, Dr. Pychynski concluded that Overcash was unable to perform light or sedentary work. (D.I. 7-17 at 54) However, the ALJ noted that Dr. Pychynski's assessment was inconsistent with Overcash's treatment notes and findings of normal gait and full lower extremity strength. (D.I. 7-2 at 22; D.I. 7-9 at 17; D.I. 7-11 at 39; D.I. 7-14 at 54; D.I. 7-15 at 71, 73; D.I. 7-16 at 32-35, 49) Furthermore, Dr. Pychynski previously noted Overcash's normal gait, normal muscle tone, and full strength in her upper and lower limbs. (D.I. 7-19 at 110, 115-116)

The ALJ also assigned "some weight" to the opinion of Ms. Duch because her medical source statements were not supported by other medical evidence in the record. (D.I. 7-2 at 22) In March 2016, Ms. Duch opined that Overcash could not sit for longer than thirty minutes and could not ambulate consistently. (D.I. 7-17 at 27) In a January 2017 medical source statement, Ms. Duch stated that Overcash could lift five pounds occasionally, walk 400 feet, stand for two nonconsecutive hours in an eight-hour workday, sit for three hours in an eight-hour workday, and

remain at her workstation for five hours in an eight-hour workday. (D.I. 7-17 at 49) Ms. Duch concluded that she could not perform sedentary or light work for eight hours per day. (*Id.* at 50) In January 2018, Ms. Duch opined that Overcash could occasionally lift five pounds, stand for ten to fifteen minutes at one time, walk half of a mile slowly, sit for six hours in an eight-hour workday with frequent breaks, and remain at her workstation for four hours in an eight-hour workday. (D.I. 7-20 at 41) Ms. Duch concluded that Overcash could not perform sedentary or light work for eight hours per day. (*Id.* at 42) However, the ALJ stated that the evidence of record did not support limitations as severe as stated in Ms. Duch's opinions. (D.I. 7-2 at 22) Overcash's treatment notes reflect normal gait and full lower extremity strength. (D.I. 7-9 at 17; D.I. 7-11 at 39; D.I. 7-14 at 54; D.I. 7-15 at 71, 73; D.I. 7-16 at 32-35, 49) Furthermore, Overcash reported that her pain decreased with activities of daily living, exercising, and walking. (D.I. 7-13 at 7; D.I. 7-14 at 32-36, 40; D.I. 7-16 at 74-76)

The ALJ assigned "limited weight" to the opinion of Dr. Skolfield because her findings were inconsistent with normal examination findings in the record. (D.I. 7-2 at 21) Dr. Skolfield, in a December 2016 functional capacity evaluation, opined that Overcash was unable to perform at the sedentary level in an eight-hour workday because of decreased lower extremity range of motion, pain, and fatigue. (D.I. 7-18 at 102) However, the ALJ noted that the evidence of record reveals normal examination findings inconsistent with the functional capacity evaluation. (D.I. 7-2 at 21) Specifically, treatment notes reflect a normal gait, normal muscle tone, and full strength in her extremities. (D.I. 7-9 at 17; D.I. 7-11 at 39; D.I. 7-14 at 54; D.I. 7-15 at 71, 73; D.I. 7-16 at 32-35, 49; D.I. 7-19 at 110, 115-116)

Furthermore, Overcash asserts that a medical opinion need not be "free of any doubt [or] 100% consistent" and that, viewed in this light, the opinions of her treating sources are not

inconsistent with the treatment records. (D.I. 10 at 19) Overcash cites SSR 96-2p to support this assertion. *(Id.)* However, SSR 96-2p states: "a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) *as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion.*" SSR 96-2p (emphasis added). Overcash cites no legal authority to support her assertion that several allegedly inconsistent medical opinions, read together, leads to the conclusion of consistency within the record. (D.I. 10 at 19-23) Moreover, these medical opinions were also internally inconsistent with their examination findings. Here, as outlined above, substantial evidence supports the ALJ's determination that the medical opinions of Dr. Newswanger, Dr. Pychynski, Ms. Duch, and Dr. Skolfield were inconsistent with evidence of record.

Moreover, Overcash suggests that the ALJ impermissibly relied on her own lay judgment to discredit the opinions of her treating medical sources. (D.I. 10 at 22-23) If an ALJ chooses to reject the treating physician's assessment, they may do so only on the "basis of contradictory medical evidence" not because of his or her "own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). Further, "an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments," but that does not "override the medical opinion of a treating physician that is supported by the record." *Id.* at 318.

The ALJ did not substitute her lay opinion for the opinions of Dr. Newswanger, Dr. Pychynski, Ms. Duch, and Dr. Skolfield, but rather afforded their opinions some, little, or limited weight because of inconsistencies with the evidence in the record. Thus, substantial evidence

supports the ALJ's evaluations of the opinions of Dr. Newswanger, Dr. Pychynski, Ms. Duch, and Dr. Skolfield. Therefore, the court recommends denying-in-part plaintiff's motion for summary judgment and granting-in-part defendant's motion for summary judgment.

### ii. Vocational Expert Testimony

Overcash argues that the ALJ failed to describe with specificity all of her demonstrated impairments in her hypothetical to the VE, thereby failing to consider all limitations in determining his residual functional capacity. (D.I. 10 at 16-17) The Third Circuit has held that "[a] hypothetical question must reflect *all* of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (internal quotations omitted) (emphasis in original) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). In *Ramirez*, the court found that the ALJ's hypothetical that excluded the plaintiff's limitations regarding concentration, persistence, or pace was deficient. *See id.* at 554.

However, the Third Circuit has also recognized that in order "to accurately portray a claimant's impairments, the ALJ must include all '*credibly established limitations*' in the hypothetical." *Zirnsak*, 777 F.3d at 614 (emphasis in original). "[L]imitations that are supported by medical evidence and are 'otherwise uncontroverted in the record' *must* be included in the ALJ's hypothetical for us to rely on the VE's response to that hypothetical." *Id.* (emphasis in original). If a limitation is supported by medical evidence, but opposed by other evidence in the record, "the ALJ has discretion to choose whether to include that limitation in the hypothetical." *Id.* at 615. "[T]he ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible." *Id.*

27

Here, Overcash's limitations outlined in the assessments of Dr. Newswanger, Dr.

Pychynski, Ms. Duch, and Dr. Skolfield were controverted by other evidence in the record, as

outlined in section (IV)(b)(i) *supra*. It was, therefore, properly within the ALJ's discretion

whether to submit the limitations to the VE. *See id.* Accordingly, the ALJ properly exercised

her discretion to exclude the limitations outlined in Dr. Newswanger, Dr. Pychynski, Ms. Duch,

and Dr. Skolfield's assessments. Therefore, the court recommends denying-in-part plaintiff's

motion for summary judgment and granting-in-part defendant's motion for summary judgment.

### iii. Overcash's Migraine Headaches

Overcash argues that the ALJ's RFC finding fails to account for limitations arising from

her migraine headaches. (D.I. 10 at 23-27) Overcash asserts that the ALJ failed to provide any

explanation as to why she dismissed any limitations as a result of Overcash's menstrual

migraines. (*Id.* at 26) The Third Circuit has noted:

> [i]n making a residual functional capacity determination, the ALJ must consider
> all evidence before him. Although the ALJ may weigh the credibility of the
> evidence, *he must give some indication of the evidence which he rejects and his*
> *reason(s) for discounting such evidence*. In the absence of such an indication, the
> reviewing court cannot tell if significant probative evidence was not credited or
> simply ignored.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (internal quotation

marks and citations omitted) (emphasis added).

The ALJ noted that Overcash reported migraines occurring around her menstrual cycle.

(D.I. 7-2 at 19) She acknowledged that Overcash testified to her alleged inability to work due, in

part, to her migraines. (*Id.* at 20) The ALJ observed Overcash's treatment of her migraine

headaches with Tylenol and noted her MRI and MRA testing was normal. (*Id.* at 20-21) In

making her RFC finding, the ALJ stated that "environmental limitations would prevent possible

migraine triggers . . . [and] [t]he record does not support greater limitations." (D.I. 7-2 at 21-22)

However, the ALJ failed to credit, refute, or otherwise explain contradictory medical evidence regarding Overcash's migraine headaches. (D.I. 7-2) Moreover, the ALJ fails to explain the nexus, if any, between environmental limitations and migraine headaches associated with Overcash's menstrual cycles. The court recommends that, on remand, the ALJ must review all of the pertinent medical evidence and explain her "conciliations and rejections" concerning the functional effects of Overcash's migraine headaches in the RFC assessment. *Burnett*, 220 F.3d at 122. Therefore, the court recommends granting-in-part Overcash's motion for summary judgment, denying-in-part the Commissioner's motion for summary judgment, and remanding for further administrative proceedings consistent with this recommendation.

## V.   CONCLUSION

For the foregoing reasons, the court recommends granting-in-part and denying-in-part Overcash's motion for summary judgment (D.I. 9), granting-in-part and denying-in-part the Commissioner's cross-motion for summary judgment (D.I. 14), and remanding-in-part for further administrative proceedings to address the functional effects of Overcash's migraine headaches in assessing her residual functional capacity.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: March __, 2020

Sherry R. Fallon
United States Magistrate Judge